# In the
# United States Court of Appeals
## For the Seventh Circuit

———————

Nos. 06-4178, 06-4179, 06-4180 & 06-4181

DANIEL L. FREELAND, Trustee,

*Plaintiff-Appellee,*
*Cross-Appellant,*

*v.*

ENODIS CORPORATION and WELBILT HOLDING COMPANY,

*Defendants-Appellants,*
*Cross-Appellees,*

and

MARION H. ANTONINI, et al.,

*Defendants,*
*Cross-Appellees.*

———————

Appeals from the United States District Court for the
Northern District of Indiana, Hammond Division at Lafayette.
Nos. 4:01-CV-72, 4:04-CV-64 & 4:04-CV-65—**Allen Sharp**, *Judge.*

———————

ARGUED OCTOBER 23, 2007—DECIDED SEPTEMBER 2, 2008

———————

Before BAUER, CUDAHY and SYKES, *Circuit Judges*.

CUDAHY, *Circuit Judge.*     These appeals arise out of bankruptcy proceedings in which Daniel Freeland, Trustee for Consolidated Industries Corp. (Consolidated), sought to recover transfers made by Consolidated to Welbilt Corporation, a company now known as Enodis Corporation (Enodis). The bankruptcy court concluded that the Trustee could avoid over $30 million in transfers made by Consolidated between 1989 and 1998 and the district court affirmed. In addition, the district court, having withdrawn the reference on two of the Trustee's claims, found that the Trustee could avoid transfers made within one year of the filing of Consolidated's bankruptcy petition pursuant to 11 U.S.C. §§ 547 and 548. The defendants appeal these decisions. In his cross-appeal, the Trustee challenges the lower courts' rejection of his alter ego/veil piercing claims against the corporate defendants, the district court's refusal to enter judgment against Welbilt Holding Company and the grant of summary judgment for the individual defendants. We conclude that the Trustee can avoid transfers from Consolidated to Enodis between 1989 and 1995 as fraudulent transfers but remand for further findings on the issue of Consolidated's solvency after 1995. We reverse and remand the district court's grant of summary judgment for the Trustee on his § 547 and § 548 claims. With respect to the Trustee's cross-appeal, we remand for further findings on the Trustee's alter ego/veil piercing claims but affirm the remainder of the district court's judgment.

## I. Background

In the 1980s, Consolidated was a successful furnace manufacturer. It was a subsidiary of Welbilt Holding Company, which itself was a subsidiary of Enodis.[1] Enodis was a publicly-traded company and defendants David and Richard Hirsch and their friend Lawrence Gross were its primary shareholders. In 1988, the Wall Street leveraged buyout (LBO) firm Kohlberg & Co. acquired Enodis' stock through a company it formed, Churchill Acquisition Corporation (Churchill). After the leveraged buyout, Churchill owned 63.4% of Enodis' stock and the Hirsches and Gross owned 36.6%. The Hirsches and Gross became Consolidated's directors following the LBO. They were removed from the board in October 1990 and were succeeded by Marion Antonini and Daniel Yih.

Enodis directed Consolidated and its other subsidiaries to deposit its receivables in an account that Enodis controlled. Consolidated's deposits in the account were recorded as assets and Consolidated's assets were reduced by amounts that Enodis used to pay Consolidated's expenses. In February 1989, Enodis directed Consolidated to pay a cash dividend of $6.9 million. In addition, Enodis directed Consolidated to issue two dividend notes (the Notes) to Welbilt Holding. The first, a 10-year note with an interest rate of 13.75%, had a principal amount of $20 million. The second, a 10-year note

---

[1] We will refer to "Welbilt Corporation" as "Enodis" so as to avoid any confusion with Welbilt Holding Company, which will be referred to as "Welbilt Holding."

with an interest rate of 13.75%, had a principal amount of $10 million.

Both dividend notes provided that:

> The principal of this Note represents the payment of a dividend declared by the maker's board of directors and therefor is payable only out of funds legally available for the payment of a dividend. If this Note is not paid in full when due, the undersigned hereby agrees to pay all costs and expenses of collection, including reasonable attorneys' fees.

The Notes provided that if Consolidated failed to make an interest payment, they would "become immediately due and payable at the option of the payee." The Notes also stated that they were governed by Indiana law. Enodis collected the interest payments on the Notes by taking funds from Consolidated's deposits in Enodis' accounts and directing that Consolidated make the appropriate book entries. Between 1989 and the end of 1997, Enodis took $23,671,421.32 in interest payments from Consolidated.

Meanwhile, Consolidated began to design a new product line, a project dubbed "Project 92." In 1987, Congress set new standards affecting the furnace manufacturing industry that were to take effect in 1992, and Consolidated's management believed that the company would have to redesign its furnaces in order to comply with the new standards. To this end, Consolidated borrowed $7 million from Tippecanoe County in order to purchase new equipment that was required to manufacture the

"Project 92" furnace. Enodis guaranteed the loan. As it worked to get its new furnace line off the ground, Consolidated began to confront problems with its horizontal furnaces. A defect in the furnaces was causing fires and warranty claims were not covered by Consolidated's insurance. In 1990, North Carolina's Attorney General investigated Consolidated's furnaces and concluded that they were defective. In 1993, the Consumer Product Safety Commission (CPSC) began investigating another defect in Consolidated's furnaces. About this same time a group of consumers in California threatened to file a class action law suit, further threatening Consolidated's prospective financial health.

By 1994, Enodis had begun trying to sell Consolidated. In 1995, perhaps to make Consolidated more attractive to prospective purchasers, Enodis cancelled the $30 million in dividend notes. Enodis found an interested buyer in William Hall. Hall could not secure financing to purchase Consolidated, however, and the sale to Hall did not close. Consolidated's problems continued to grow. The California class action was certified and in 1997, the CPSC asked Consolidated to recall all of its furnaces in California. In January 1998, Hall, Welbilt Holding and Enodis entered into a Stock Purchase Agreement pursuant to which Welbilt Holding agreed to sell Hall the common stock of Consolidated. In connection with the transaction, Consolidated borrowed $7.5 million from Finova Capital Corporation (Finova) and granted Finova a lien on all of its assets. On January 5, 1998, Enodis loaned Consolidated $108,500 to purchase insurance. On January 6, 1998, the

Hall sale closed. Consolidated directed Finova to wire $7,108,500 of the money it borrowed from Finova to Enodis. Seven million dollars corresponded to the purchase price of Consolidated's stock pursuant to the Stock Purchase Agreement. The rest represented repayment of Enodis' January 5 loan to Consolidated. On May 28, 1998, almost five months after the Hall transaction, Consolidated filed for bankruptcy under chapter 11 of the United States Bankruptcy Code.

On May 10, 1999, Consolidated filed this lawsuit. A trustee was appointed and was substituted as the plaintiff. The bankruptcy case was subsequently converted to chapter 7. Section 544(b) of the Bankruptcy Code allows the Trustee to "avoid any transfer of an interest of the debtor in property . . . that is voidable under applicable law." 11 U.S.C. § 544(b). The Trustee sought to recover the $6.9 million cash dividend and the interest paid on the Notes, asserting a right to recover these sums under state and federal law governing fraudulent transfers, Indiana common and corporate law and the law of unjust enrichment. In addition, the Trustee brought breach of fiduciary duty claims against the Hirches, Gross, Antonini and Yih, asserted alter ego/veil piercing claims against Enodis and Welbilt Holding and argued that Enodis' claim should be disallowed or equitably subordinated. The Trustee also sought to recover the value of the transfers made in connection with the Hall transaction. The district court withdrew the reference as to Counts VIII and IX of the Trustee's Third Amended Complaint, which related to the Hall transaction.

Some of the Trustee's claims were disposed of on summary judgment. In October 2001, the bankruptcy court granted summary judgment for the Hirsches and Gross on the Trustee's breach of fiduciary duty claims, finding that the claims were barred by the applicable statute of limitations. On December 9, 2002, the district court granted summary judgment against Enodis and Welbilt Holding on the Trustee's claims arising from the Hall transaction. The court concluded that the Trustee could recover $7,369,559.35 as fraudulent transfers pursuant to 11 U.S.C. § 548. This amount represented $7 million that Consolidated directed Finova to transfer to Enodis on January 6, 1998 as well as $369,559.35 that Consolidated transferred to Enodis between May 28, 1997 and December 30, 1997. The district court also concluded that the Trustee could recover the $108,500 that Consolidated transferred to Enodis on January 6, 1998 as a preference under 11 U.S.C. § 547.

The bankruptcy court conducted a 22 day trial on the remaining counts. After hearing testimony from 19 witnesses and weighing the evidence, which included 457 exhibits, the court concluded that the Trustee was entitled to avoid $30,608,990.69 in transfers from Consolidated to Enodis between 1989 and 1998. This amount comprised the $6.9 million cash dividend as well as $23,671,421.32 in interest charged on the Notes between 1989 and 1998. The bankruptcy court found that the Trustee could recover the entire $30,608,990.69 under theories of actual fraud and unjust enrichment as well as under Indiana common law. The court also concluded that the Trustee could avoid $10,058,731 of those transfers

as constructively fraudulent conveyances. In addition, the court disallowed Enodis' proof of claim. The court rejected the Trustee's alter ego/veil piercing claims against Enodis and Welbilt Holding on standing grounds. The court awarded the Trustee $12,780,302.10 in prejudgment interest for a total recovery of $43,389,292.79. Enodis appealed the bankruptcy court's decision and the Trustee filed a cross-appeal. The district court affirmed the bankruptcy court's proposed findings of fact and conclusions of law in their entirety. Both parties appeal that decision. We have jurisdiction pursuant to 28 U.S.C. § 158(d).

## II.  Discussion

The parties raise many challenges to the conclusions of the courts below. We group the issues raised in these appeals as follows: (1) Enodis' appeal of the district court's avoidance of the 1989 $6.9 million cash dividend and the interest payments on the Notes; (2) Enodis' appeal of the district court's grant of summary judgment for the Trustee in connection with the Hall transaction; and (3) the Trustee's cross-appeal.

### A.  Avoidance of interest payments and the $6.9 million cash dividend

We review the bankruptcy court's factual findings for clear error and its legal conclusions de novo. *In re Rivinius, Inc.*, 977 F.2d 1171, 1175 (7th Cir. 1992). "If the bankruptcy court's 'account of the evidence is plausible in light of the

record viewed in its entirety,' we will not reverse its factual findings even if we 'would have weighed the evidence differently.'" *In re Lifschultz Fast Freight*, 132 F.3d 339, 343 (7th Cir. 1997) (quoting *Anderson v. City of Bessemer City*, 470 U.S. 564, 573-74 (1985)). Mixed questions of law and fact are subject to de novo review. *Mungo v. Taylor*, 355 F.3d 969, 974 (7th Cir. 2004).

### 1. The Notes rendered Consolidated insolvent

Enodis' primary challenge to the avoidance of the interest payments and the cash dividend is that the courts below improperly valued the Notes, which led them to conclude that Consolidated was insolvent after the Notes were issued in 1989. The bankruptcy court's finding that Consolidated was insolvent from the time the Notes were issued to the date it filed its bankruptcy petition was central to its conclusion that the Trustee can recover all transfers made by Consolidated to Enodis under each theory of recovery asserted by the Trustee. Enodis does not dispute that at the time the Notes were issued, the amounts of the principal of the Notes exceeded Consolidated's assets. Rather, the parties' dispute centers on how to value the Notes for the purposes of determining Consolidated's solvency between 1989 and the time the Notes were cancelled in 1995. The Trustee contends that the Notes represented liabilities in the amount of $30 million. For its part, Enodis argues that the restrictive language on the Notes prohibited Consolidated from paying any principal on the Notes if doing so would render Consolidated insolvent. Thus, Enodis contends, the fair

value of the Notes could not be $30 million unless Consolidated had $30 million in funds available for a shareholder distribution, i.e., unless Consolidated could pay the full principal on the Notes and remain solvent. We review the interpretation of the Notes de novo. *See Rizzo v. Pierce & Assocs.*, 351 F.3d 791, 793 (7th Cir. 2003) ("Interpretation of an unambiguous contract is a question of law.").

Under Indiana and federal law, a debtor is insolvent if the fair value of its debts exceeds the fair value of its assets. IND. CODE § 32-18-2-12; 28 U.S.C. § 3302. Before the bankruptcy and district courts, Enodis contended that the Notes represented contingent liabilities. A contingent liability is "one that depends on a future event that may not even occur[ ] to fix either its existence or its amount." *In re Knight*, 55 F.3d 231, 236 (7th Cir. 1995); *see also In re Mazzeo*, 131 F.3d 295, 303 (2d Cir. 1997); *In re Nicholes*, 184 B.R. 82, 88 (9th Cir. BAP 1995); *In re McGovern*, 122 B.R. 712, 715 (Bankr. N.D. Ind. 1989). Because an entity's liability on a contingent debt may never come into being, a contingent liability is not valued at its full amount when assessing the entity's solvency. Rather, a contingent liability is valued at its face amount multiplied by the probability that it will become due. *In re Xonics Photochemical, Inc.*, 841 F.2d 198, 200 (7th Cir. 1988).

We agree with the courts below that Consolidated's obligation on the Notes was not contingent. The creation of Consolidated's debt to Welbilt Holding did not depend on the occurrence of an extrinsic future event. Consolidated promised to pay a sum certain on a date certain. The

only question was whether Consolidated would have the funds available to pay the amount due on the Notes. Enodis attempts to rely on *Delphi Industries, Inc. v. Stroh Brewery Co.*, 945 F.2d 215 (7th Cir. 1991), to support its argument that the Notes were conditional or contingent liabilities. That case involved several loans that, according to the parties' unwritten understanding, were to be paid out of the cash flow or proceeds from the sale of a company. We considered whether the loans could be breached if the funds from which they were to be paid did not exist and concluded that they could be breached. *Id.* at 217-18. Rather than bolstering Enodis' argument, *Delphi Industries* supports our conclusion that a limitation on the source from which an obligation can be paid does not render that obligation contingent.

On appeal, Enodis attempts to reframe the issue, asserting that the restrictive language on the Notes constitutes a condition precedent that, if unsatisfied, would have nullified Consolidated's obligation. This argument too is unavailing. "A condition precedent is either a condition which must be performed before the agreement of the parties becomes binding, or a condition which must be fulfilled before the duty to perform an existing contract arises." *Barrington Mgmt. Co. v. Paul E. Draper Family Ltd. P'ship*, 695 N.E.2d 135, 141 (Ind. Ct. App. 1998). In this case, Consolidated's obligation on the Notes arose when it executed and delivered them. By their terms, the Notes are unconditional promises to pay the principal amount on a date certain as well as interest accruing quarterly. The Notes provided that they would "become immediately due and payable at the option of the payee" upon

the occurrence of certain specified events, including Consolidated's failure to make an interest payment. If the Notes were not paid in full when due, Consolidated was bound "to pay all costs and expenses of collection." Interpreting each Note as a whole, *Beanstalk Group, Inc. v. AM Gen. Corp.*, 283 F.3d 856, 860 (7th Cir. 2002), we agree with the courts below that the Notes created uncon-ditional, noncontingent obligations on the part of Con-solidated. Although we believe this conclusion emerges from the language of the Notes themselves, *id.* at 859, we note that Enodis charged Consolidated interest pursuant to the Notes and Consolidated performed its obligation to pay that interest, indicating that the parties themselves did not intend Consolidated's obligation on the Notes to be subject to the fulfillment of a condition at some future date.

Enodis also argues for the first time on appeal that the Notes were essentially declared but unpaid dividends and should be treated as other courts have treated stock redemption obligations or accrued but unpaid dividends. In general, arguments not raised before the district court are waived. *Prymer v. Ogden*, 29 F.3d 1208, 1215 (7th Cir. 1994). Further, this case is distinguishable from the cases cited by Enodis because Consolidated delivered the Notes, which by their terms included express promises to pay the principal amount and interest, in payment of the dividends it declared. In addition, in one case on which Enodis seeks to rely, *In re Joshua Slocum Ltd.*, 103 B.R. 610 (Bankr. E.D. Pa. 1989), the court adopted the debtor's treatment of redeemable stock as stockholders' equity and concluded that the redemption value of the

stock was not required to be treated as debt in determining solvency. Here, as in *In re Joshua Slocum*, the courts below accepted the parties' accounting treatment of the Notes as well as expert testimony as to how the Notes should be valued. In sum, we find that the courts below properly included the full value of the Notes as liabilities in their solvency analyses.

2.  Consolidated's solvency after the Notes were cancelled

The Notes were cancelled in September 1995 and prior to their cancellation, they rendered Consolidated insolvent. We turn our attention to the bankruptcy court's solvency finding after the Notes were cancelled. In order to conclude that Consolidated was insolvent after the Notes were cancelled, the bankruptcy court had to find that the fair value of Consolidated's liabilities continued to exceed its assets. In its proposed findings of fact and conclusions of law, the bankruptcy court did not specifically value Consolidated's assets or liabilities after the Notes were cancelled. Rather, it stated simply that "[b]y the time the dividend notes were cancelled in 1995, the contingent claims had become so numerous, so potentially expensive and so severe that—even after being discounted for their contingent nature—they were sufficient to render Consolidated insolvent." Appellants' App. at 38.

On appeal, Enodis argues that the bankruptcy court erred by failing to estimate Consolidated's contingent liabilities—a catch-all term used by the court that

includes product liability and warranty claims. In *Xonics*, we stated that it is necessary to discount a contingent liability "by the probability that the contingency will occur and the liability become real." 841 F.2d at 200. It "must be reduced to its present, or expected, value before a determination can be made whether the firm's assets exceed its liabilities." *Id*. We reaffirmed the importance of discounting analysis in *Covey v. Commercial Nat'l Bank of Peoria*, 960 F.2d 657 (7th Cir. 1992), noting that "[d]iscounting a contingent liability by the probability of its occurrence is good economics and therefore good law." *Id*. at 660. While "[a]bsolute precision . . . is not required," a bankruptcy court must calculate an appropriately discounted value for contingent liabilities. *In re Advanced Telecomm. Network, Inc.*, 490 F.3d 1325, 1336 (11th Cir. 2007).

In the present case, the bankruptcy court did not value the contingent liabilities, merely comparing them to "an impending storm that initially looks small when it is on a distant horizon but grows ever darker and more dangerous as it approaches." Appellants' App. at 38. This description, although imaginative, does little to illuminate our understanding of the claims' value. The district court accepted the bankruptcy court's finding. Neither court placed a value on the claims, performed the required discounting analysis or indicated that it relied on any record evidence that purported to perform the required discounting.

The Trustee urges us to conclude that the bankruptcy court followed *Xonics* based on the court's statement

that Consolidated's contingent liabilities rendered the company insolvent "even after being discounted for their contingent nature." *Id*. But Federal Rule of Civil Procedure 52(a), made applicable to bankruptcy proceedings by Bankruptcy Rule 7052, requires a bankruptcy court to make findings that supply a clear understanding of the grounds underlying the court's decision. *See Andre v. Bendix Corp.*, 774 F.2d 786, 801 (7th Cir. 1985) ("Rule 52(a) necessitates that the findings of fact on the merits include as many of the subsidiary facts as are necessary to disclose to the reviewing court the steps by which the trial court reached its ultimate conclusion on each factual issue.") (quoting *Denofre v. Transp. Ins. Rating Bureau*, 532 F.2d 43, 45 (7th Cir. 1976) (per curiam)). Although Rule 52(a) does not require a court to discuss the relevance and importance of each piece of evidence, *Mozee v. Jeffboat, Inc.*, 746 F.2d 365, 370 (7th Cir. 1984), it does require a court to clearly state the factual basis for its ultimate conclusion. *Kelley v. Everglades Drainage Dist.*, 319 U.S. 415, 422 (1943). In this case, the issue of solvency was highly contested by the parties and the absence of adequate subsidiary findings prevents us from being able to conduct a meaningful review as to whether the court's conclusion that Consolidated was insolvent after 1995 is clearly erroneous. The Trustee seeks to rely on the testimony of its expert and on Consolidated's internal financial statements to support the conclusion that Consolidated was insolvent after the Notes were cancelled, but it is not our station to weigh the evidence and make the findings that are necessary to support the decision. *Mozee*, 746 F.2d at 370; *In re Cesari*, 217 F.2d

424, 428 (7th Cir. 1954). Remand is required for further subsidiary findings that indicate the factual basis for the bankruptcy court's solvency determination after the Notes were cancelled in 1995.

  3.  The transfers made prior to the cancellation of the
      Notes are recoverable as actual fraudulent transfers

The lower courts found that the Trustee could avoid all transfers made pursuant to the Notes between 1988 and 1998 as well as the $6.9 million cash dividend under a theory of actual fraud.[2] A finding of fraudulent intent is a finding of fact that we review for clear error. *See In re Acequia, Inc.*, 34 F.3d 800, 805 (9th Cir. 1994); *In re Jeffrey Bigelow Design Group, Inc.*, 956 F.2d 479, 481 (4th Cir. 1992); *Springmann v. Gary State Bank*, 124 F.2d 678, 681 (7th Cir. 1941). It is not our station to review factual issues de novo, and we will reverse the findings of the bankruptcy court only if we are "left with the definite and firm con-

---

[2] The Indiana and federal statutes provide that in the case of actual fraud, a cause of action does not begin to accrue until the transfer has been or could reasonably have been discovered. IND. CODE § 32-18-2-19(1)(B); 28 U.S.C. § 3306(b)(1). The bankruptcy court concluded that Consolidated's creditors could not have discovered the transfers when they occurred because the transfers only appeared on Consolidated's internal financial statements and in inter-company memoranda directing that the transfers be made. Thus, the bankruptcy court tolled the statute of limitations to allow the Trustee to recover all of the transfers made between 1989 and 1998.

viction that a mistake has been committed." *Anderson*, 470 U.S. at 573 (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948)). "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Id*. at 574.

Under Indiana law, present and future creditors can avoid transfers that were made "with actual intent to hinder, delay, or defraud any creditor of the debtor." IND. CODE § 32-18-2-14. "Proof of fraudulent intent need not be made by direct evidence under Indiana law" and can be inferred from the presence of certain "badges of fraud." *United States v. Denlinger*, 982 F.2d 233, 236 (7th Cir. 1992). These badges include a transfer of property that renders the debtor insolvent or greatly diminishes his estate; a transaction whereby the debtor retains the benefit of the transferred property; a transfer that is made while litigation is pending; secret transactions outside the usual mode of business; a transfer conducted in a manner different from ordinary methods; and a transfer made in exchange for little or no consideration. *Otte v. Otte*, 655 N.E.2d 76, 81 (Ind. Ct. App. 1995). Although "[n]o one badge of fraud constitutes a per se showing of fraudulent intent," *Buffington v. Metcalf*, 883 F. Supp. 1198, 1200 (S.D. Ind. 1994), the presence of a number of badges of fraud "is said to 'create . . . an overwhelming presumption of fraud' or to 'raise . . . a strong inference of fraudulent intent.'" *Denlinger*, 982 F.2d at 236 (citations omitted). Once a Trustee establishes the presence of a number of badges of fraud, the burden shifts to the debtor to provide a legitimate purpose for the challenged

transfers. *In re Acequia*, 34 F.3d at 806; *Jones v. Cent. Nat'l Bank of St. Johns*, 547 N.E.2d 887, 890-91 (Ind. Ct. App. 1989), *superseded by statute on other grounds as recognized by Gipperich v. State*, 658 N.E.2d 946, 950 (Ind. Ct. App. 1995).

In this case, the bankruptcy court found the presence of several badges of fraud: the transfers were made to an insider; they occurred when Consolidated was being sued and threatened with suit; Consolidated did not receive reasonably equivalent value for the transfers; Consolidated was insolvent when the transfers were made; the transfers were made outside the normal mode of doing business; the transfers were secret; and Consolidated was left without the assets needed to pay its debts.

Enodis attacks the bankruptcy court's actual fraud conclusion on several grounds. First, it asserts that the court misapplied the badges of fraud. Enodis contends that the bankruptcy court erred in finding that the transfers made pursuant to the Notes were concealed and made outside the usual mode of doing business. Although we do not dispute Enodis' assertion that a dividend may be paid in the form of a note, the Notes in the present case were issued for value in excess of Consolidated's assets. *See Litton Indus., Inc. v. Comm'r*, 89 T.C. 1086, 1099 (Tax Ct. 1987) (where company had earnings and profits in excess of $30 million, a $30 million distribution in the form of a note constituted a dividend). In addition, the bankruptcy court found that the $6.9 million dividend paid in February 1989 was never

declared by Consolidated's board of directors. Enodis contends that this conclusion is clearly erroneous because a former director of Consolidated testified that the dividend was declared at a board meeting. But it is for the bankruptcy court to assess the credibility of witnesses and weigh evidence, and we will not second guess the court's resolution of conflicting evidence. *See Anderson*, 470 U.S. at 575. Enodis also faults the bankruptcy court for stating that "the transfers were secret in the sense that they were discernable only by reviewing bookkeeping entries concerning inter-company transfers," arguing that Consolidated was privately-held and had no duty to publicly disclose its finances. Appellants' App. at 41. But the court also noted that creditors who inquired about Consolidated's "finances would have been given only financial information for [Enodis], which did not reflect any information concerning the transfers from Consolidated." *Id*. at 43. The bankruptcy court's findings thus support its conclusion that the transfers were secret and outside the usual mode of doing business.

Enodis also contends that there was insufficient evidence to support the conclusion that the transfers were made at a time when Consolidated was being sued or threatened with suit. Whether a transfer is fraudulent "must be judged by the circumstances existing at the time of the conveyance and not by subsequent events having no actual connection with the transaction." *United States v. Smith*, 950 F. Supp. 1394, 1404 (N.D. Ind. 1996) (citing *Stamper v. Stamper*, 83 N.E.2d 184 (Ind. 1949); *Deming Hotel Co. v. Sisson*, 24 N.E.2d 912 (Ind. 1940)). Contrary to Enodis' assertions, the bankruptcy court did not base its finding of the litigation badge of fraud on the CPSC and

California class action lawsuit, which occurred after 1992. The court heard testimony from Consolidated's former president, Richard Weber, that Consolidated began to see an increase in warranty and litigation claims in the mid-1980s and that he notified Consolidated's other directors about these claims. The court's reference to lawsuits against Consolidated by 1990 shows that the possible furnace-related claims against Consolidated that existed when the Notes and $6.9 million dividend were paid were more than the hypothetical lawsuits to which every corporation may be subject. It was reasonable for the court to infer from Consolidated's awareness of serious problems with its furnaces and the existence of lawsuits following fast on the heels of the Notes' being issued that Consolidated knew it faced significant furnace-related claims when it issued the Notes. As for Enodis' contention that the furnace-related liabilities were not viewed as a significant problem and that Consolidated had insurance to cover product liability claims, we decline Enodis' invitation to reweigh the evidence and testimony on this point. *See Anderson*, 470 U.S. at 574-75.[3]

We also reject Enodis' challenge to the bankruptcy court's finding that the transfers left Consolidated without assets to pay its debts. Enodis argues that any

---

[3] Enodis also contends that the courts below used improper hindsight analysis in making their fraudulent intent determinations. This argument reiterates Enodis' points relating to the litigation badge of fraud and we reject it for the same reasons we reject its challenges to the litigation badge of fraud.

finding of actual fraud is negated by a good faith belief on the part of Consolidated's management as to the company's financial future. But the Trustee elicited testimony from Weber that Consolidated was unable to make expenditures that were crucial to its prospective economic stability because it transferred all of its cash to Enodis in the form of interest payments, undermining the claim that management believed in good faith that Consolidated would continue to be profitable into the 1990s.

Enodis argues that the lower courts' conclusion that Consolidated did not receive reasonably equivalent value in exchange for the interest paid on the Notes is inconsistent with their conclusion that the Notes rendered Consolidated insolvent. Under Indiana law, "[v]alue is given for a transfer or an obligation if, in exchange for the transfer or obligation, property is transferred or an antecedent debt is secured or satisfied." IND. CODE § 32-18-2-13(a). The bankruptcy court concluded that although in general interest paid on an obligation constitutes reasonably equivalent value, because the Notes were issued as dividends, and because dividends do not return value to the company, the Notes and the interest paid on the Notes lacked reasonably equivalent value. We agree with Enodis that there is inconsistency in the bankruptcy court's solvency and reasonably equivalent value conclusions. Since the court treated the Notes as contractual obligations of Consolidated, Consolidated was obligated to pay the interest that accrued on the Notes. Consolidated's payment of the accrued interest constituted "dollar-for-dollar forgiveness of a contractual debt," which

is "reasonably equivalent value." *In re Carrozzella & Ricardson*, 286 B.R. 480, 491 (D. Conn. 2002).

Despite this inconsistency, we affirm the court's actual fraud finding based on the presence of the other badges of fraud. The transfers were to an insider at a time when Consolidated was insolvent and facing mounting furnace-related liabilities. They were concealed from creditors and were outside the normal mode of doing business. *See, e.g., Brandon v. Anesthesia & Pain Mgmt. Assocs., Ltd.*, 419 F.3d 594, 600 (7th Cir. 2005) (criticizing district court for concluding that five badges of fraud were insufficient to support liability); *Denlinger*, 982 F.2d at 236 (presence of four badges of fraud created presumption of fraudulent intent). The transfers occurred to ensure that Enodis received the bulk of Consolidated's cash during a time when Consolidated was likely going to be facing increasing warranty and liability claims related to its furnaces. Although another court might weigh the evidence differently, we cannot say that the bankruptcy court's finding of actual fraudulent intent is clearly erroneous.

Enodis raises several other challenges to the lower courts' actual fraud analysis, which we will address briefly. It argues that the courts below improperly based their rulings on Enodis' intent rather than on Consolidated's intent. But the bankruptcy court's recognition of the sizable benefits Enodis derived from the transfers is insufficient to prove that the court failed to consider Consolidated's intent. Nor do we agree with Enodis that evidence adduced at trial shows the bankruptcy court's

fraudulent intent finding to be implausible "in light of the record viewed in its entirety." *Anderson*, 470 U.S. at 574; *see also Malachinski v. Comm'r*, 268 F.3d 497, 506 (7th Cir. 2001). Enodis also contends that the lower courts' determination that Messrs. Antonini and Yih did not act recklessly or willfully in allowing the transfers to continue after they joined Consolidated's board of directors in 1990 and 1991 undermines the courts' actual fraud findings. It argues that because corporations can act only through individuals, the absence of intentional misconduct on the part of Antonini and Yih negates the possibility that Consolidated effected the transfers with fraudulent intent. But Antonini and Yih were not directors when the Notes were issued so the fact that they may have acted negligently, as the bankruptcy court suggested, in allowing Consolidated to continue making interest payments on the Notes does not negate the lower courts' determination that the Notes were devised as a scheme to hinder, delay or defraud Consolidated's creditors.

Finally, Enodis contends that the courts below misconstrued the purpose of the Notes, asserting that they represented a way for Consolidated to distribute money to its shareholder in a way that would result in tax savings. The fact that Consolidated saved $465,000 in state income taxes by making the distributions as interest payments does not negate the court's determination that Consolidated intended to hinder, delay or defraud its creditors by making the transfers. Further, the bankruptcy court found that Consolidated transferred $9.5 million more than was necessary to save on its state income taxes, a finding that Enodis does not dispute. We affirm the judgment of the courts below with respect to the

$6.9 million cash dividend and transfers made pursuant to the Notes before the Notes were cancelled in 1995.[4]


## B.  Hall transaction

The Trustee sought to avoid transfers that Consolidated made to Enodis within one year of its bankruptcy filing under 11 U.S.C. §§ 547 and 548. The district court withdrew the reference on these claims. Under § 548, the Trustee sought to recover $7,000,000 that Consolidated transferred to Enodis in connection with Hall's purchase of Consoli-

---

[4]  The lower courts concluded that the Trustee could avoid over $10 million in transfers as constructively fraudulent conveyances. Constructive fraud requires the trustee to show that the debtor transferred its property within the statutory look-back period, that it did not receive reasonably equivalent value in exchange for the transfer and that the debtor was insolvent at the time of or as a result of the transfer. IND. CODE. § 32-18-2-15; 28 U.S.C. § 3304. Our conclusion that the lower courts' solvency analysis is inconsistent with their conclusion that Consolidated did not receive reasonably equivalent value in exchange for the interest payments leads us to conclude that the courts below erred in finding that the Trustee could avoid the transfers as constructively fraudulent. This does not affect our conclusion that the Trustee can recover the transfers since they are recoverable as actually fraudulent transfers. Because we conclude that the transfers are recoverable as actually fraudulent, we need not discuss whether they could also be recovered under the law of unjust enrichment or Indiana common law, as the courts below held.

dated in January 1998.[5] The Trustee also alleged that between May 28, 1997 and December 30, 1997, Consolidated transferred $15,815,582.36 into accounts controlled by Enodis. During this period, Enodis made transfers from its accounts on Consolidated's behalf, and the Trustee sought to recover $369,559.35, the difference between Consolidated's deposits and the amount Enodis spent on its behalf. In order to prevail on a fraudulent transfer claim under § 548(a), a trustee must establish that the debtor transferred an interest in property within one year of the petition date, that the debtor received less than reasonably equivalent value in exchange for the transfer and that the debtor was insolvent or was rendered insolvent as a result of the transfer. 11 U.S.C. § 548(a)(1)(B).

The Trustee also sought to avoid Consolidated's January 6, 1998 transfer of $108,500 to Enodis as a preference under § 547. A trustee may avoid a transfer under § 547 if it (1) was made to or for the benefit of a creditor, (2) was for or on account of an antecedent debt, (3) was made while the debtor was insolvent, (4) was made between ninety days and one year before the petition was filed and (5) allowed the creditor to receive more than it otherwise would have. 11 U.S.C. § 547(b).

Both parties moved for summary judgment on these claims and the court granted judgment for the Trustee.

---

[5] The Trustee also argued in the alternative that the $7,000,000 transfer should be avoided as a preference under § 547. Because the court concluded that the transfer could be avoided pursuant to § 548, it never reached the Trustee's § 547 argument.

Summary judgment is appropriate where, viewing the evidence and construing all reasonable inferences in favor of the non-moving party, the court concludes that there is no genuine issue for trial. *Jordan v. Summers*, 205 F.3d 337, 341-42 (7th Cir. 2000). "A genuine issue for trial exists only when a reasonable jury could find for the party opposing the motion based on the record as a whole." *Roger v. Yellow Freight Sys., Inc.*, 21 F.3d 146, 149 (7th Cir. 1994). We review the grant of summary judgment de novo. *Moser v. Ind. Dep't of Corr.*, 406 F.3d 895, 900 (7th Cir. 2005).

The district court concluded that when Consolidated transferred money to Enodis in connection with the Hall transaction several months before Consolidated filed for bankruptcy, it was insolvent. *In re Consolidated Indus. Corp.*, 292 B.R. 354, 359-61 (N.D. Ind. 2002). The court also concluded that Consolidated received no value as a result of the transaction. *Id.* at 359. Therefore, the court concluded, the Trustee could avoid the $7 million and the $369,559 amounts under § 548. The court also determined that the $108,500 transfer from Consolidated to Enodis in January 1998 was a voidable preference under § 547.

On appeal, Enodis challenges the court's determination that Consolidated was insolvent at the time of the transfers, claiming that the district court improperly weighed evidence in granting summary judgment for the Trustee. We agree. In concluding that Consolidated was insolvent, the court relied on Consolidated's internal financial statements. *Id.* at 360. In opposing summary judgment,

Enodis proffered a draft audit as evidence that Consolidated was solvent prior to the Hall transaction. The district court rejected the audit's evidentiary value, stating that "[a]n uncompleted draft is not better evidence of the fair value than the statements prepared by Consolidated and sworn to by the highest manager of accounting of Consolidated." *Id.* at 361. Enodis also submitted a report by its expert, Keith Gardner. The court noted that inconsistencies existed between Gardner's deposition testimony and the conclusion he reached in his expert report and appears to have disregarded his report. *Id.* at 360.

On appeal, the Trustee defends the district court's solvency ruling, asserting that the draft audit had not been authenticated and was excludable as unreliable hearsay evidence. But the Trustee did not make this argument before the district court and thus has waived it. *Zayre Corp. v. S.M. & R. Co.*, 882 F.2d 1145, 1150 (7th Cir. 1989) ("An evidentiary objection not raised in the district court is waived on appeal . . . and this rule holds as true for a summary judgment proceeding as it does for a trial.") (internal citation omitted). The Trustee also argues that remand would be pointless because during the trial before the bankruptcy court, the author of the draft audit testified that if he had completed it, it would have shown that Consolidated was insolvent. When we review a district court's grant of summary judgment, our review is limited to the information that was before the court when it made its ruling. *Hildebrandt v. Ill. Dep't of Natural Res.*, 347 F.3d 1014, 1024 (7th Cir. 2003) (citing

*Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 242 (4th Cir. 2002); *Chapman v. AI Transp.*, 229 F.3d 1012, 1028 (11th Cir. 2000)). Thus, we will not consider the testimony that was elicited at trial. With respect to the district court's treatment of the defendant's expert's report, the court appears to have discredited his report in part because of inconsistencies with his deposition testimony. But credibility determinations are not a matter for summary judgment. *Washington v. Haupert*, 481 F.3d 543, 550 (7th Cir. 2007). Viewing the evidence in the light most favorable to Enodis, as we must on summary judgment, we conclude that Enodis adduced evidence sufficient to raise a genuine issue of material fact as to Consolidated's solvency in the year prior to the filing of the bankruptcy petition.

Enodis contends that the district court should have entered summary judgment for Enodis on the fraudulent transfer issue because Consolidated received reasonably equivalent value in exchange for the challenged transfers and that we should enter judgment in its favor. Enodis faults the district court for failing to view Consolidated's transfers to Enodis and transfers made by Enodis as part of a single, integrated transaction in which Consolidated received reasonably equivalent value in exchange for the Hall transaction transfers. But Enodis did not make this argument before the district court and we will not consider it for the first time on appeal. *See Republic Tobacco v. N. Atl. Trading Co.*, 381 F.3d 717, 728 (7th Cir. 2004); 10A WRIGHT, MILLER & KANE, FEDERAL PRACTICE AND PROCEDURE § 2716 (3d ed. 1998). Moreover, the Trustee

raised alternative theories of recovery, namely, that he could recover the transfers as preferences or as actual fraudulent transfers. The district court did not address these theories, precluding entry of summary judgment for Enodis. *Chicago College of Osteopathic Med. v. George A. Fuller Co.*, 719 F.2d 1335, 1340-41 (7th Cir. 1983). We reverse the court's entry of summary judgment for the Trustee and remand for trial as to the Trustee's preference and fraudulent transfer claims.[6]

## C.  Trustee's Cross-Appeal

### 1.   Alter ego/veil piercing claims

The Trustee brought alter ego/veil piercing claims against Enodis and Welbilt Holding, seeking a judgment that the Trustee could collect from Enodis and Welbilt Holding any amounts needed to satisfy Consolidated's creditors. The bankruptcy court concluded that the Trustee lacked standing under §§ 541(a) or 544(a) of the Bankruptcy Code to bring these claims. On appeal from the bankruptcy court, the district court concluded that the Trustee did in fact have standing to bring alter ego/veil piercing claims against Enodis and Welbilt Holding under

---

[6]  We note that the district court purported to avoid the same $369,559.35 transfer twice—once in affirming the bankruptcy court's conclusion that the Trustee could avoid transfers made between 1989 and 1998, and once in granting summary judgment for the Trustee on his § 548 claims. The Trustee is entitled to recover this amount once and the district court should ensure that this amount is not awarded twice again following remand.

§ 541.[7] However, the court stated that it agreed with the bankruptcy court's "ultimate legal conclusion that the Trustee's claims fail under that section." Appellants' App. at 87. The Trustee contends that the district court erred in concluding that the Trustee was not entitled to judgment on his alter ego/veil piercing claims by purporting to adopt a ruling that the bankruptcy court never made and by failing to review de novo the merits of the Trustee's claims.

In order to prevail on an alter ego/veil piercing claim under Indiana law, a court will consider whether the plaintiff has adduced evidence showing:

> (1) undercapitalization; (2) absence of corporate records; (3) fraudulent representation by the corporation's shareholders or directors; (4) use of the corporation to promote fraud, injustice, or illegal activities; (5) payment by the corporation of individual obligations; (6) commingling of assets or affairs; (7) failure to observe required formalities; or (8) other shareholder acts or conduct ignoring, controlling or manipulating the corporate form.

*Nat'l Soffit & Escutcheons, Inc. v. Superior Sys., Inc.*, 98 F.3d 262, 265-66 (7th Cir. 1996) (citing *Aronson v. Price*, 644 N.E.2d 864, 867 (Ind. 1994)). As we have already noted, Rule 52(a) requires that the court in a bench trial set forth "findings, stated either in the court's opinion or

---

[7] The district court affirmed the bankruptcy court's ruling that the Trustee lacked standing to assert alter ego/veil piercing claims under § 544(a). The Trustee does not appeal this determination.

separately, which are sufficient to indicate the factual basis for the ultimate conclusion." *Rucker v. Higher Educ. Aids Bd.*, 669 F.2d 1179, 1183 (7th Cir. 1982) (citation omitted). Doing so serves two purposes: "(1) to provide appellate courts with a clear understanding of the basis of the trial court's decision, and (2) to aid the trial court in considering and adjudicating the facts." *Bartsh v. Nw. Airlines, Inc.*, 831 F.2d 1297, 1304 (7th Cir. 1987).

In the present case, the district court's opinion does not indicate the factual basis for its conclusion that the Trustee has not presented evidence to support his alter ego/veil piercing claims. Although "findings on every issue presented in a case are unnecessary if the trial court has found such essential facts as lay a basis for the decision," *In re Lemmons & Co.*, 742 F.2d 1064, 1070 (7th Cir. 1984), in the present case, the courts below did not include any factual findings relating to the merits of the Trustee's alter ego/veil piercing claims. The decision to disregard the corporate form is a "highly fact-sensitive inquiry," *Winkler v. V.G. Reed & Sons, Inc.*, 638 N.E.2d 1228, 1232 (Ind. 1994), and in light of the district court's cursory treatment of the Trustee's claims, we are unable to discern the basis of the court's "ultimate conclusion on each factual issue." *Denofre*, 532 F.2d at 45. Thus, we vacate and remand with directions to the district court to comply with Rule 52(a).

### 2. Judgment against Welbilt Holding

The Trustee argues that the district court should have entered judgment against Welbilt Holding under 11

U.S.C. § 550(a)(1), which allows a trustee to recover transfers that have been avoided "from the initial transferee of such transfers or the entity for whose benefit the transfers were made." The district court declined to enter judgment against Welbilt Holding on the grounds that judgment in the entire amount had been entered against Enodis and that 11 U.S.C. § 550(d) entitled the Trustee to only a single satisfaction of the judgment amount. Section 550(d) provides that "[t]he trustee is entitled to only a single satisfaction under subsection (a) of this section." The Trustee contends that the district court misconstrued § 550(d) and that although § 550(d) precludes the Trustee from collecting more than once, it does not prevent a court from entering judgment against more than one party. There is some support for the Trustee's position. As defined in the Bankruptcy Code, "or" is not exclusive. *See* 5 COLLIER ON BANKRUPTCY ¶ 550.02[4] at 550-16 (Alan N. Resnick et al., eds., 15th ed. rev. 2007) (citing 11 U.S.C. § 102(5)). "Thus, the trustee can recover from any combination of the entities mentioned [in § 550] subject to the limitation of a single satisfaction." *Id*. Even if the district court erred, however, in order for the Trustee to be entitled to judgment against Welbilt Holding, he must establish that Welbilt Holding was an entity for whose benefit the transfers were made. The bankruptcy court found that "[t]he record does not indicate that any of Consolidated's money went to [Welbilt] Holding. . . . None of the transfers from Consolidated to [Enodis] were advantageous to [Welbilt] Holding." Appellants' App. at 50. The Trustee does not challenge that finding, arguing that because the transfers

were actually owed to Welbilt Holding, it is an entity for whose benefit they were made.

Although a few courts have found that an entity need not actually obtain a benefit in order to be an entity for whose benefit a transfer was made, *see, e.g.*, *In re Richmond Produce Co.*, 118 B.R. 753 (Bankr. N.D. Cal. 1990), requiring that the entity actually receive a benefit from the transfer is consistent with the "well-established rule that fraudulent transfer recovery is a form of disgorgement, so that no recovery can be had from parties who participated in a fraudulent transfer but did not benefit from it." *In re McCook Metals, L.L.C.*, 319 B.R. 570, 591 (Bankr. N.D. Ill. 2005); *see also In re Meredith*, 527 F.3d 372, 376 (4th Cir. 2008) ("[A] person must actually receive a benefit from the transfer in order to be an 'entity for whose benefit' the transfer was made."); *In re Compton Corp.*, 831 F.2d 586, 595 (5th Cir. 1987). Imposing liability on a nontransferee based on the debtor's intent to benefit him, without requiring proof that the nontransferee actually benefitted from the transfer, "bears no relationship to the theory of cancellation that historically underlies avoidance remedies." Larry Chek & Vernon O. Teofan, *The Identity and Liability of the Entity for Whose Benefit a Transfer Is Made under Section 550(a): An Alternative to the Rorschach Test*, 4 J. BANKR. L. & PRAC. 145, 156 (1995). Because Welbilt Holding did not derive a benefit from the transfers, we affirm the district court's refusal to enter judgment against Welbilt Holding.

3.   Hirsch defendants

The courts below concluded that the Trustee's claims against defendants Hirsch, Hirsch and Gross were barred by Indiana's two-year statute of limitations on breach of fiduciary duty claims and granted their motion for summary judgment. Under Indiana law, a claim for breach of fiduciary duty is subject to the two-year statute of limitations that applies to tort claims for injury to personal property. *Shriner v. Sheehan,* 773 N.E.2d 833, 846 (Ind. Ct. App. 2002). The Trustee filed this action on May 10, 1999. Although the filing date was almost nine years after the Hirsch defendants left Consolidated's board, the Trustee argues that the two-year limitations period should have been tolled under the adverse domination doctrine. The doctrine of adverse domination allows the tolling of the statute of limitations

> where the entity [to whom the cause of action belonged] is controlled by or dominated by wrongdoers. The statute of limitations begins to run again when the wrongdoers lose control of the entity. The rationale behind the adverse domination doctrine is premised upon the principle that officers and directors who have harmed the entity cannot be expected to take legal action against themselves.

*Resolution Trust Corp. v. O'Bear, Overholser, Smith & Huffer*, 840 F. Supp. 1270, 1284 (N.D. Ind. 1993) (citation omitted) (alteration in original).[8] The courts below concluded

---

[8]  It is unclear whether the adverse domination doctrine applies in Indiana, *City of E. Chi. v. E. Chi. Second Century, Inc.*, 878 (continued...)

that Marion Antonini, who replaced Hirsch, Hirsch and Gross in October 1990, was "a disinterested outsider from the standpoint of any wrong which his predecessors may have committed." Appellants' App. at 90. Thus, any claim the Trustee had against the Hirsch defendants accrued in October 1990 and the applicable statute of limitations required Consolidated to bring its breach of fiduciary duty claims against the Hirsch defendants by October 1992.

When the Hirsch defendants moved for summary judgment, they asked the court to accept the facts in the Trustee's Third Amended Complaint as true. In the Third Amended Complaint, the Trustee alleged that Enodis controlled the composition of Consolidated's board of directors through January 1998. But this allegation is insufficient to create a genuine issue of material fact as to whether the Hirsches exerted any control over Consolidated after they left the board such that they would be in a position to prevent the company from suing them for breach of fiduciary duty. *Celotex v. Catrett*, 477 U.S. 317, 331 (1986). We affirm the bankruptcy court's conclusion that the statute of limitations for the Trustee's claims against

---

[8]  (...continued)
N.E.2d 358, 381 n.22 (Ind. Ct. App. 2007), although one court has assumed that it does. *Resolution Trust Corp.*, 840 F. Supp. at 1284 (basing its decision on the "supposition" that an Indiana court would apply the adverse domination doctrine to toll the statute of limitations until the defendants no longer dominated the board of directors). We assume for the purposes of this discussion that the doctrine was available to the Trustee.

the Hirsch defendants began running in 1990 and had lapsed by the time the bankruptcy petition was filed in 1998.

### III.  Conclusion

To summarize, we affirm the district court's judgment allowing the Trustee to recover the $6.9 million dividend and transfers made pursuant to the Notes prior to the cancellation of the Notes in 1995. We remand for further findings on the court's solvency determination after the Notes were cancelled. We reverse and remand the court's entry of summary judgment for the Trustee on the transfers related to the Hall transaction. We vacate the judgment against the Trustee on his alter ego/veil piercing claims and remand for further proceedings consistent with this opinion. Finally, we affirm the district court's refusal to enter judgment against Welbilt Holding and its entry of summary judgment for the Hirsch defendants. AFFIRMED in part, REVERSED in part, VACATED in part and REMANDED with directions. Each party shall bear its own costs of these appeals.